**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Eddie RICHARDSON, Carmen Tate, Rodney Palmer, Nate Hall, Stanley Westmoreland, Martell Lee, Sectric Curry, and Lennel Smith, Defendants–Appellants.**

Nos. 95–3053, 95–3054, 96–2551, 96–2587, 96–2591, 96–2644, 96–2682 and 96–3197.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1997.

Decided Nov. 14, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 95–3054 Jan. 7, 1998.

766

Barry Rand Elden, Chief of Appeals, Jerome N. Krulewitch (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for United States of America.

William A. Barnett, Jr. (argued on behalf of Appellants Eddie Richardson and Nate Hall), Chicago, IL, for Eddie Richardson.

Anita Rivkin–Carothers (argued), Chicago, IL, for Carmen Tate.

Carl P. Clavelli (argued), Chicago, IL, for Rodney Palmer.

Stanley L. Hill, Robert D. Whitfield, J. Clifford Greene, Jr., Hill & Associates, Chicago, IL, for Nate Hall.

Stephen E. Eberhardt, Chicago, IL, for Stanley Westmoreland.

Lazar Pol Raynal, Corey Rubenstein (argued), William P. Zieglemueller, McDermott, Will & Emery, Chicago, IL, for Martell Lee.

Patrick W. Blegen, Thomas A. Durkin (argued on behalf of Appellants Stanley Westmoreland, Sectric Curry, and Lenell Smith), Chicago, IL, for Sectric Curry.

Patrick T. Driscoll, Jr., Janice C. Breen, Hickey, Driscoll, Kurfirst, Patterson & Melia, Chicago, IL, for Lenell Smith.

Before BAUER, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

It wasn't Alice's Restaurant, but starting in 1990, if it was crack you wanted, you could get it at Highway Beef, a stand at the corner of Gladys and Cicero on the west side of Chicago. During the late 1980's, if it was heroin you wanted, you could get it two blocks away at the Courtway Building on Congress at Cicero. And all the dope came courtesy of a conspiracy involving members of a street gang with a charming name—the Undertaker Vice Lords. The gang operated around Cicero Avenue, near the point where it is bisected by the Eisenhower Expressway.

The operation was put out of business, and on March 23, 1994, a three-count indictment was filed charging conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846;

charging two leaders—Eddie Richardson and Carmen Tate—with engaging in a continuing criminal narcotics enterprise, in violation of § 848; and charging Tate and another person with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. A jury trial in the district court involving a gaggle of defendants ran from March 29, 1995, until May 23, 1995, before Judge James F. Holderman; the eight defendants currently before us were found guilty on all the charges against them, although three others who went to trial were acquitted. In addition, one alleged gang member was convicted in a separate trial and several others entered guilty pleas. Sentencings were held over a 1-year period from August 1995 until August 1996. Sectric Curry, Nate Hall, Richardson, and Tate received life imprisonment; Martell Lee and Stanley Westmoreland received 324 months; Rodney Palmer received 292 months, and Lennel Smith 194 months, sentences which vividly show how much society's attitudes about drugs have changed since Alice's time.

The Undertaker Vice Lords were formed in the 1970's by Eddie Richardson. The gang was organized in a hierarchy with five groups of members called "generations"; members of each generation were people of roughly the same age who joined the gang at roughly the same time. Each generation had its own "King" and "Prince." Richardson was the "King of all the Undertakers" and a "Universal Elite" within the Vice Lord Nation. Tate had no rank but was a member whom, it is said, all Undertakers looked up to. The alleged conspirators in this case came from several of the generations and some were leaders of their generations. Richardson was the one who designated who would be a leader. Two members of the fourth generation, Michael Sargent and Johnnie Chew, and a member of the fifth generation, Andre Cal, pled guilty and testified for the government at trial.

The government alleged that Richardson not only controlled the gang but also oversaw the distribution of heroin, crack cocaine, and powder cocaine. Richardson and Tate were said to permit only members of the Undertakers and others granted permission by them to sell drugs in the Undertakers territory. The drugs were sold at well-established drug "spots," and there were established locations for preparing and packaging the drugs. A Chicago Police Department search of one of the latter locations in June 1985 uncovered a kilogram of heroin, irons, mixing bowls, blenders, and strainers. During the search Tate asked the police to let everyone else go because the heroin belonged to him; he said that he bagged it himself because he did not trust his workers. From the packaging locations, runners delivered the drugs to the drug spots and collected the money, and the workers then sold the drugs. Richardson and Tate enforced the rules regarding drug sales by a system of punishments called "violations." The violations ranged from not being allowed to continue selling, to beatings with bricks, bottles, or ax handles, being stabbed or shot, and even, at least once, to being killed.

The sale of heroin was the primary object of the conspiracy from 1984 until 1990. From 1984 until 1987 brown heroin was distributed out of the Courtway Building in packs which contained 25 $25 packets of user quantities of heroin. For each pack sold, the workers were paid $100, and Richardson and Tate received the balance. From the winter of 1987 until the end of 1988 Chew ran the heroin spot in the Courtway Building. He estimated that during that time, the Undertakers sold a "frame"—25 packs of 25 bags—every 3 to 4 days, or approximately 25 kilograms of brown heroin. Others selling brown heroin from the Courtway Building included Hall and Westmoreland. Smith also admitted to selling heroin for Richardson and Tate at Cicero and Van Buren and Laramie and Van Buren and, in a tape-recorded conversation, he said he worked for Tate and Richardson from 1985 to 1988, making about $50,000.

In the fall of 1988 Richardson and the Undertakers began to distribute white heroin from the Courtway Building. Chew initially was the runner, followed by Darryl Joyner, Lee, and Sargent. Lee was arrested in January 1989 carrying $2,700 in cash and a beeper. After the arrest, Sargent assumed Lee's responsibilities; Richardson provided

Sargent with an average of $40,000 to $60,000 worth of heroin three times a week. Joseph Westmoreland, who was convicted in a separate trial, estimated that the conspiracy was collecting about $20,000 to $30,000 per day. Based on these statements, the Undertakers sold slightly more than 100 kilograms of white heroin between 1988 and 1990.

Others were also involved in the heroin operation. Curry sold heroin while Sargent was the runner; in fact, Sargent considered Curry his best worker. Curry was arrested in August 1989 and, in a tape-recorded conversation, told an agent that he made more than $50,000 selling drugs for Richardson and Tate. Hall sold heroin from the Courtway Building from May 1988 until December 1988. In a June 1991 conversation with a government agent, Hall confirmed that he was selling heroin for Richardson and that he had been working for Tate and Richardson since 1983. He claims he made approximately $60,000. Lee also was involved in the white heroin trafficking. On October 9, 1990, and November 24, 1990, Lee sold an agent 19 $20 bags of white heroin.

In November 1990 the Undertakers branched into the distribution of crack, primarily from the beefstand at the corner of Gladys and Cicero. Cal testified that he and Tate cooked a quarter kilo of cocaine into crack two to three times a week for 10 months. That would mean that during that time, they sold over 25 kilograms of crack. Curry, Hall, Lee, Palmer, Smith, and Westmoreland each participated in the sale of crack at the beefstand.

Richardson and Tate also oversaw the distribution of powder cocaine. In 1988 Chew became a runner for cocaine. In addition, Hall, Curry, and Lee were involved in the cocaine operation.

The conspiracy was uncovered when, beginning in 1988, John Rotunno, an agent with the Bureau of Alcohol, Tobacco & Firearms, began an undercover investigation into an illegal gun trade on the west side. In August 1990 he abandoned that investigation and began looking into narcotics sales and street gangs. Posing as the brother of confidential informant Debra Schwede, Rotunno said he was a large marijuana dealer from California who had been arrested by the DEA and was currently on parole. He began to make small purchases of narcotics from low-level members of the gang, who then cooperated with the government.

The facts just recited have been, as required, viewed in the light most favorable to the government. The defendants don't agree. First, they say, this was not one big conspiracy with a monopoly on the Cicero Avenue drug trade. To the extent the defendants sold drugs, they claim to have sold them as members of several smaller conspiracies. Being a member of the Undertakers, they say, does not make one a member of an overarching drug conspiracy. That there is a variance between the indictment and the proof—that is, that there were several smaller conspiracies rather than one large one—is not a novel argument in drug cases, and the law is well-established. We will summarize briefly.

■ A contention that there were several conspiracies, rather than the one charged, amounts to a "challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). The court considers the evidence in the light most favorable to the government, defers to the credibility findings of the jury, and overturns a verdict only when the record contains no evidence from which the jury could find guilt beyond a reasonable doubt. *United States v. Hickok*, 77 F.3d 992 (7th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996).

■ A conspiracy is a combination of two or more persons joined to further a common purpose or design. *United States v. Shorter*, 54 F.3d 1248 (7th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 250, 133 L.Ed.2d 176 (1995). To establish that an individual was a member of a conspiracy the government must prove that the individual knew of the conspiracy and intended to join and associate himself with its criminal design and purpose. *United States v. Auerbach*, 913 F.2d 407 (7th Cir.1990). The government need only prove the existence of the

conspiracy and a participatory link with each defendant. *United States v. Caudill,* 915 F.2d 294 (7th Cir.1990). The scope of the conspiracy is determined by the scope of the agreement between the defendants. The government must show that a defendant joined the agreement, not the group. The defendant need not have known all the other conspirators nor have participated in every aspect of the conspiracy. A key question is whether the defendants had a mutual interest in achieving the goal of the conspiracy.

 The question whether there is one conspiracy or several is a question of fact, which is "something especially within the jury's realm of expertise," and for that reason the jury "gets first crack" at deciding the issue. *United States v. Paiz,* 905 F.2d 1014, 1019 (7th Cir.), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). If the jury is properly instructed on the possible existence of multiple conspiracies, the "finding of a single conspiracy must stand unless the evidence taken in the light most favorable to the government, would not allow a reasonable jury so to find." *United States v. Mealy,* 851 F.2d 890, 898 (7th Cir. 1988), quoting *United States v. Urbanik,* 801 F.2d 692, 695 (4th Cir.1986).

 It is not relevant that the evidence might also be consistent with an alternate theory; say, that there were multiple conspiracies. Even if the evidence could arguably establish multiple conspiracies, there is no material variance from an indictment charging a single conspiracy. *See Townsend* at 1389.

Applying these principles to this case, we will briefly mention a few minor points raised by the defendants, which need not detain us long. First is the claim that the government somehow confused membership in the Undertakers with an agreement to join the conspiracy. We agree, of course, that the important point is not whether the defendants were Undertakers, nor whether they sold drugs. That they were Undertakers who sold drugs is virtually conceded. The issue is whether they sold drugs as members of the charged conspiracy. There must be evidence that they did if the convictions are to be sustained. We will return in a moment to

the question of the sufficiency of the evidence.

Secondly, we note that there is no challenge to the jury instructions which were given, and those instructions properly included instructions—in fact, the defendants' proposed instructions—as to the possibility of multiple conspiracies. The jury was properly instructed and returned its verdict that the eight individuals before us—though not the three it acquitted—were members of one overarching conspiracy. That determination is within the jury's realm of expertise.

Third, the multiple versus single conspiracy issue—which dominates the defendants' arguments-is premised, in part, on the characterization of the government's approach in this case as spinning a huge web and dragging in all sorts of undeserving people. To some degree the argument is one which invokes a sympathetic response. Curry, for instance, was portrayed as a pathetic addict, selling to meet his own needs.

But the argument loses some of its zip when we look at what exactly this conspiracy was all about. It was—as the indictment alleges—a conspiracy to sell on the street, user quantities of narcotics. Except for the leaders, Richardson and Tate, it appears that everyone was, in one way or another, simply a street seller or runner. This indictment did not attempt to show a far-ranging conspiracy involving the importers, the couriers who brought the drugs to Chicago, or the sources from whom Richardson and Tate obtained the drugs. This is a localized, neighborhood operation. What makes it large is the length of time it existed and, partly because of the length of time, the large quantities of drugs distributed. But in some sense, this conspiracy is a small part of what might be a much larger conspiracy.

 Having made those preliminary remarks, we turn to the issue at hand. Does the evidence support the existence of one conspiracy? What exactly is the defendants' argument that the evidence is suspect? What was the scope of the agreement? Did the defendants have a mutual interest in achieving a goal?

There seems to be little question that the conspiracy existed from 1984 until 1991 and had three objectives: monopolizing the sale of heroin; monopolizing the sale of crack in 1990 and 1991; and controlling who sold cocaine in Undertaker territory. Each of the defendants had agreements with other members of the group. They worked together as runners and workers to distribute drugs for Richardson and Tate. They worked specific, established spots where drugs were sold. They received a portion of the proceeds as payment for their efforts.

The defendants contend, however, that the government failed to prove that all drug sales within Undertaker territory were performed on behalf of Richardson or Tate; it failed to show a monopoly. The defendants point to evidence of drug sales which were unrelated and say that the government attempted to explain these away as instances in which people were granted permission to sell by Richardson. They seem to argue that the existence of other operations within Undertaker territory means that there were multiple conspiracies.

So, what was the evidence the defendants point to to support their claim that there was not one but multiple conspiracies? Chew, the government witness, said on direct examination that the Undertakers controlled the drug trade and had a policy on violations, but on cross-examination he said that although he was fired by Richardson for stealing drug money, he himself was never "violated" and continued his drug activities with Tate until he went to work for himself. When he worked for himself he bought cocaine from anyone he could. Andre Cal, who also testified for the government, said that he became a worker for another unrelated street operation conducted by codefendant Lee. There is an allegation about two competing cocaine operations: one run by Tate whose pony packs had staples through them; and one run by Curtis Kirkland, whose packs were marked with red marks. Cal, like Chew, said he was not punished for stealing money from Richardson. Cal also testified that he went into the cocaine business with Anthony Flowers, and later, when Flowers was arrested, Cal became partners with another man named Scott. This drug business was independent of the Undertakers' operation. Sargent, another conspirator who testified, said that there were several other drug operations in Undertaker territory which were not shut down. But he also said that they were not shut down because they were no competition to Richardson's operation.

This in brief is the evidence on which the defendants rely to say that the Richardson–Tate conspiracy was not a monopoly and therefore multiple conspiracies existed. But why do the defendants see evidence of other independent dealings as fatal to the government's case?

Some of the time, the defendants seem almost to argue that the government is under some obligation to prove a monopoly; if Richardson and Tate did not monopolize the drug trade in Undertaker territory, there was a fatal variance between the government's theory that they did and the proof at trial which showed some sales which were independent of the conspiracy. We note first that in an ordinary case there is no requirement that a conspiracy achieve some sort of monopoly in order to exist. A conspiracy can exist side by side with another conspiracy. One person can be a member of more than one conspiracy, just as any person can hold down more than one job. *United States v. Blanding*, 53 F.3d 773 n. 2 (7th Cir.1995). It seems clear, however, that disloyalty of this sort to the conspiracy was strongly discouraged in this case. There are many instances of "violations." They range from beatings with bricks, bottles, and sticks to a beating which resulted in death. But again, evidence that a few people did something in violation of the rules without getting punished could be viewed by the jury as something other than evidence that those persons were not members of this conspiracy or that there were multiple conspiracies. Perhaps those people got away with something. The jury in this case was properly instructed as to the possibility of multiple conspiracies and chose to determine that eight of those indicted were members of the charged conspiracy and that three were not.

Other times what the defendants seem to be saying is that the government proceeded

on a theory of monopoly and then changed theories midstream—a claim which is relevant also to the discussion that will follow regarding a request for a bill of particulars. By the time we became acquainted with this case, the government's theory was that the Richardson–Tate conspiracy controlled the heroin trade in Undertaker territory. The theory also was that the conspiracy controlled the crack trade in 1990 and 1991 but that the control of cocaine sales was less complete, and some unconnected sellers were operating either because their sales did not threaten the conspiracy or because Richardson gave them permission to operate. The defendants see this theory as different from the government's theory at the outset of the case.

■ We are not so sure. The indictment alleged that "the sale of user quantities of cocaine, cocaine base and heroin in Undertaker Territory was subject to the approval of defendants EDDIE RICHARDSON and CARMEN TATE." Now the government is saying that there was control of the heroin and crack markets for periods of time, but that cocaine sales were not so tightly controlled in that other cocaine dealers operated either with approval or because they were not large enough to be a threat. Nothing in that theory is materially inconsistent with the indictment.

Next, the defendants say that the statement in the government's February 21, 1995, proffer also reveals an inconsistency. The statement says that "[u]nder the rules of the gang, no one could sell heroin in Undertaker Territory without the permission of Richardson." We are unable to find an inconsistency between that theory and the one we have been presented.

But the defendants' real contention, we believe, is that the government's theory was that the gang had a monopoly and that therefore anyone who sold drugs in the territory was considered by the government to be a member of this conspiracy, virtually without any other proof. They say:

> As shown at trial, there were numerous people selling drugs within the area established for the single, overall conspiracy charged in the indictment who had no

agreement with Richardson or Tate.... The defendants, in their requests for a bill of particulars, repeatedly objected that the government's true theory was that the charged conspiracy was the gang and membership in the gang amounted to membership in the conspiracy.... Furthermore, the government's explanations of "permission" or "no competition" were merely afterthoughts to salvage the indictment once the trial testimony made clear that rather than a single overall conspiracy led by Richardson and Tate, there existed a myriad of independent drug sellers who were operating throughout Undertaker territory—some in virtual head to head competition with each other.

Or as Curry puts it more explicitly, the government's theory was that Richardson and Tate controlled the neighborhood "to such an extent that the only drugs available in that neighborhood came from Richardson or Tate and were sold by gang members."

If the government had relied solely on a syllogism—that Richardson and Tate had a monopoly on drug sales in the Undertaker territory; defendants sold drugs in the territory; therefore defendants sold drugs for Richardson and Tate and were members of the conspiracy—and if there was no other evidence of the connection of the defendants to the conspiracy and further that the premise itself was faulty, the argument would have considerable force. But there was evidence and lots of it. The government presented tape recordings of each defendant except Richardson and Tate—as well as direct evidence of the acts and statements of each of the charged conspirators—sufficient to establish his personal involvement in the conspiracy. The evidence in this case was clearly sufficient to support the jury's verdict that a single conspiracy existed and that each convicted dealer was a member of the conspiracy.

■ Palmer, Smith, and Curry argue individually that there is insufficient evidence to link them to the conspiracy. We reject their arguments. Evidence of Palmer's membership includes two sales of crack to

Agent Rotunno from the beefstand in November 1990. Plus, Schwede told Rotunno that Palmer was selling crack for the Undertakers and Sargent testified that Palmer sold crack at the beefstand. The beefstand, of course, was an important part of the Richardson operation.

■ Evidence of Curry's membership came from Cal and Sargent, who identified Curry as a seller of white heroin for the Undertakers and as his best worker. Curry was arrested while selling white heroin at Harrison and Kilpatrick, another of the Undertakers' drug spots. Furthermore, Curry told Rotunno that he had made more than $50,000 selling drugs for Richardson and Tate. In addition, he sold crack from the beefstand and was one of the first workers at the beefstand. On January 14, 1991, Agent Rotunno bought 10 bags of crack from Curry, and in a taped conversation in June of that year Curry confirmed that he still worked for Richardson and Tate. He bragged—though it appears everyone discounts his claim—that he showed the Undertakers how to make rocks from cocaine.

■ As to Smith, he admitted that he sold drugs for Richardson and Tate for 3 years but claims there is no evidence that he joined the conspiracy. We disagree. He sold both heroin and crack and he witnessed a "violation." He said on tape that he made roughly $50,000 during the time he worked for Richardson and Tate. There was sufficient evidence for the jury to conclude that he was a member of the conspiracy. We now turn to several pretrial issues.

■ Curry contends that he is entitled to a new trial because Judge Holderman failed to grant his pretrial and repeated oral motions during trial for a bill of particulars. His argument is that the government changed its theory of this case mid-trial, as we just discussed. The theory at the beginning of trial, Curry says, was that membership in the Undertaker Vice Lords made one a member of the drug distribution conspiracy. When Judge Holderman made clear that theory was not going to work, Curry contends that the government, for the first time, came up with the theory that no one sold

drugs in Undertaker territory without Richardson's blessing, and if you sold drugs you thereby joined the conspiracy. In essence, Curry contends that he was involved with Curtis Kirkland, someone who, Curry says, all the government witnesses conceded was not a member of the conspiracy, and that it was this bit of information which caused the government to switch to a permission theory. Curry says he should have been granted his repeated requests for a bill identifying, at a minimum, the alleged conspirators.

■ The decision whether to require a bill of particulars is within the sound discretion of the trial judge. We will reverse a decision to deny a bill of particulars only when the judge clearly abuses his discretion. A defendant must suffer actual prejudice from the denial. *United States v. McAnderson*, 914 F.2d 934 (7th Cir.1990). But Curry is only entitled to know the offense with which he is charged, not all the details of how it will be proved. *United States v. Kendall*, 665 F.2d 126 (7th Cir.), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). As we said above, from the indictment Curry was notified of the permission theory. It said that the sale of user quantities of cocaine, cocaine base, and heroin in Undertaker territory was subject to the "approval" of Richardson and Tate. "Approval" and "permission" are words which, in this context, convey the same principle. Judge Holderman, on this point, did not abuse his discretion.

■ Richardson and Tate each argue that they should have been granted separate trials. Their basic contention is that prejudicial testimony was elicited during the cross-examination of the government witnesses. We note at the outset that most of the testimony would have been admissible in separate trials. Richardson claims that defenses antagonistic to his were presented by Curry, Dockery, and Hall. The three claimed that they were recruited by Richardson, who took advantage of their addictions to get them to sell drugs. In addition, Richardson contends that two pieces of evidence would not have been admitted in a separate trial. One was a tape of a discussion between Agent Rotunno and Curry, in which Rotunno makes a re-

mark about Richardson and Tate being "bad guys." The other is the proffer of Nate Hall, used by the government in its rebuttal case.

Tate makes a similar argument regarding antagonistic defenses; he finds the defenses of Curry, Hall, Palmer, Dockery, and another defendant, Randy Teagus (who was acquitted), were antagonistic to him regarding their claims to be addicts, selling drugs to support a habit. In addition, Hall, Palmer, and Dockery, Tate claims, solicited testimony that they were subjected to "violations" ordered by Tate and testimony that a drug seller died of a beating. Tate contends that even the government objected to the latter testimony as being prejudicial.

■ There is a preference in the federal system for joint trials of defendants who are indicted together. Nevertheless, Rule 14 of the Federal Rules of Criminal Procedure allows for an order of severance or other relief which justice may require if a defendant is prejudiced by a joinder with others. In *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Court concluded that mutually antagonistic defenses are not prejudicial per se. In fact, the Court concluded that a judge should grant a severance only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." At 539, 113 S.Ct. at 938. Even if there is a risk of prejudice, a judge must determine whether it is the type of prejudice that can be cured with limiting instructions to the jury. The decision whether to grant a severance is left to the sound discretion of the trial judge. *Id.*

■ In this case, the judge declined to order a severance but instructed the jury that it was to give separate consideration to each defendant; that each defendant was entitled to have his case decided on the evidence against him. We, of course, presume that a jury follows the instructions as given. *United States v. Crockett,* 979 F.2d 1204 (7th Cir.), *cert. denied,* 507 U.S. 998, 113 S.Ct. 1617, 123 L.Ed.2d 176. (1993). Furthermore, blame-shifting does not prevent a jury from making a reliable judgment regarding a defendant. *United States v. Ramirez,* 45 F.3d 1096 (7th Cir.1995). And as we said above, the testimony of the government witnesses, Chew, Cal, and Sargent, of which Tate especially complains, would be admissible in separate trials. As the Court said in *Zafiro*:

> [A] fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant.

At 540, 113 S.Ct. at 938. It was not an abuse of discretion to deny the motions for severance.

■ The defendants also challenge a number of evidentiary rulings. These rulings are reviewed for an abuse of discretion. *United States v. Prevatte,* 16 F.3d 767 (7th Cir.1994); *United States v. Buchbinder,* 796 F.2d 910 (7th Cir.1986); *United States v. Johnson,* 28 F.3d 1487 (8th Cir.), *cert. denied,* 513 U.S. 1098, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *United States v. Davis,* 772 F.2d 1339 (7th Cir.), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985).

■ Nate Hall objects to the exclusion of his expert witnesses. One expert was Dr. Maisha Hamilton–Bennett, who was to testify as to the extent of Hall's drug addiction which he contended went to his coercion defense. The second was Jesse Beckom, who was an expert on gangs. Hamilton–Bennett's testimony was excluded because there was no dispute that Hall was an addict and the defense did not provide timely notice of its intent to call her. In fact, the government received her report over 5 weeks into the trial. Also, other evidence—of which there was plenty—of Hall's addiction was presented to the jury by other witnesses. Beckom's testimony was excluded on the basis of relevance because he had no familiarity with the Undertaker Vice Lords or its members. We see no abuse of discretion on this point.

Hall also claims that the government should not have been allowed to use his proffer in its rebuttal case. A proffer, of course, is a defendant's (or someone who is hoping not to become a defendant) controlled statement to government agents made to facilitate plea agreements or discussions. Hall entered into a proffer agreement under which the government agreed not to use the information he provided during its case-in-chief. If Hall testified contrary to the agreement, however, or presented a position contrary to the substance of the agreement, all deals were off and the government would be allowed to use his statements against him. This sort of provision is standard fare in pretrial dealings over statements to be offered by defendants.

In Hall's proffer he said he participated in the conspiracy and began selling drugs after being approached by another member of the conspiracy. He said Richardson was the source of the heroin he sold. These statements were interpreted by the government to show that Hall was a willing participant in the conspiracy. At trial, Hall seemed to be trying to set up a defense of coercion. He called a police officer named Rodriguez to testify as to a pat-down of Hall in which drug paraphernalia was found, including a warm crack pipe and an empty bag which had previously contained crack. He was trying to show that he was a drug user and thus that he was coerced into selling drugs. This view of his situation was contrary to the gist of his proffer where he presented himself as a willing participant in the drug selling conspiracy. Under the circumstances, Judge Holderman didn't even come close to abusing his discretion when he permitted the government to use part of Hall's proffer against him as part of its rebuttal case. And it mattered not at all that Hall didn't personally testify contrary to the proffer because he in effect did the same thing by presenting Officer Rodriguez to the jury. *See United States v. Dortch*, 5 F.3d 1056 (7th Cir.), *cert. denied*, 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).

Finally, Carmen Tate argues that the district court improperly admitted evidence of a heroin seizure from him and others in June 1985. Tate claims this was evidence of a prior bad act, requiring analysis under Rule 404(b) of the Federal Rules of Evidence. But the seizure occurred during the existence of the conspiracy and the evidence was admitted pursuant to Rules 401 and 403. We see no abuse of discretion in this ruling.

Curry contends that, given his culpability and the severity of the sentence he was facing, he should have been allowed to tell the jury of his possible punishment during closing argument. Unfortunately for him, arguing punishment to a jury is taboo, as we again recently noted in *United States v. Lewis*, 110 F.3d 417 (7th Cir.1997), *cert. denied*, —— U.S.——, 118 S.Ct. 149, —— L.Ed.2d —— (1997). Furthermore, there is a difference of opinion regarding Curry's role in this offense. He claims he was a rather pathetic junkie who dealt some drugs to support his habit. Not everyone saw it that way. In his sentencing memorandum Judge Holderman, who saw the evidence firsthand, said Curry was not a minor participant in the conspiracy, but rather that he distributed and foresaw distribution of at least 30 kilograms of heroin and at least 7.5 kilograms of cocaine base.

All of the defendants contend that the prosecutor improperly vouched for witnesses during her rebuttal argument. The government virtually concedes that the prosecutor's statement was improper but contends that the response was invited by the argument of Curry's defense counsel. The relevant portions of the record are as follows: first, counsel for Curry:

> And I want to talk about one other thing Mr. Krulewitch [AUSA] mentioned. He said to you he represents the people of the United States. I think that was an attempt to somehow bring this home to you. I think it was an attempt to get some sympathy from you....
>
> Mr. Krulewitch doesn't represent the interest of the people of the United States. The people are left to the states....

These people represent the interest of the federal government from Washington. They represent the interests of the federal agen-

cies, like the Internal Revenue Service, like the U.S. Drug Enforcement Administration, like the Alcohol, Tobacco & Firearms.... But I do begrudge them trying to turn the war on drugs onto the victims of the war on drugs.

This, the government says, invited its response, given by another AUSA, Zaldwaynaka Scott:

> You heard about the government's witnesses. You heard them called all kinds of things, despicable, ridiculous, and some of the words Mr. Halprin used, I won't even repeat.
>
> And you heard about Agent Rotunno, you heard about the police officers that were called as witnesses in this case. You heard everybody called a liar. And you heard about what happened from the government's table in this case. The government put these witnesses on. The government called these liars. It's the government's fault.
>
> Well, ladies and gentlemen, if you think that Krulewitch, myself, Agent Hlista, and Agent Zopp went out there, called these people into this courtroom and put on perjured testimony, then you should acquit these men. You should send them home, because we had nothing else better to do with our careers and our lives but put on false testimony[.]

There were objections to these statements, and Judge Holderman gave an instruction to the effect that the opinions of counsel are not evidence. The jury was told to disregard the statement. In his instructions to the jury the judge also stated that it is improper for a lawyer to offer his personal opinions on the credibility of witnesses during an argument to the jury.

■ We use a two-part analysis in assessing allegations of prosecutorial misconduct in closing argument. First we consider the prosecutor's remarks in isolation to see whether they are improper. We will waste no time on this step; impropriety is virtually conceded. The second step is to consider the remarks in context to see whether they had the effect of denying the defendants a fair trial. We look to the nature and seriousness of the statement; whether it was invited by

the conduct of defense counsel; whether the jury was properly instructed to disregard the statement; whether the defense had an opportunity to counter the statement; and finally we look to the weight of the evidence against the defendants. *United States v. Johnson–Dix,* 54 F.3d 1295 (7th Cir.1995); *United States v. Severson,* 3 F.3d 1005 (7th Cir.1993).

The defendants had no opportunity to counter the prosecutor's statement, and the statement is one of which we disapprove. However, in every other regard, the factors lean against finding that the defendants were deprived of a fair trial. It is at least arguable that it was an invited response in the heat of battle, after several arguments attacking the government case. And also, importantly, the evidence in this case was such that this statement was not needed to put the government over the top. The weight of the evidence is clearly against the defendants. It defies credibility to think that one isolated statement coming at the close of a lengthy trial would sway the jury to cast aside doubts about the veracity of the government witnesses. Finally, the jury was instructed that the remark was improper, and we assume the jury follows instructions given by a judge. It was, to be sure, an improper remark, but another adjective that comes to mind is that it was a stray remark. Coming as it did, at the end of a long trial, with the judge giving a curative instruction, this remark does not make for prejudicial error.

■ Moving on to jury instructions, we note that Richardson and Tate both argue that it was error for the judge not to give a unanimity instruction to the effect that the jury had to agree on the three federal narcotics offenses constituting the continuing criminal enterprise with which they were charged in count two. The argument is based on a case from the Court of Appeals for the Third Circuit, *United States v. Echeverri,* 854 F.2d 638 (1988). In *United States v. Kramer,* 955 F.2d 479, *cert. denied,* 506 U.S. 998, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992), we expressly rejected the result in that case. We see no reason to reconsider *Kramer.*

The defendants also raise an issue regarding improper juror conduct which they say was not adequately investigated by the judge. After the close of the evidence but before closing arguments, an alternate juror wrote Judge Holderman saying that she had some concerns about the regular jurors. She said some of them "appear to be sleeping" during the presentation of evidence and that she did not think it proper that persons who would know less about the case than the alternates would be the ones deciding it. Plus, she said she had not heard some of the people say much during the time the jurors had spent together; she wondered how they could be expected to speak up in deliberations. The defendants argue that the judge should have questioned the alternate juror about the letter. We don't think that was necessary. The letter does not allege any outside contact with the jurors or untoward improprieties. We have, in fact, read the letter, and to us it seems like the alternate juror was just venting some sour grapes because she was not, after sitting in on the whole trial, going to get a chance to deliberate.

All of which brings us to sentencing issues. The defendants join in an argument that they should be sentenced under the guidelines for amounts of drugs reasonably foreseeable to them, rather than under the enhanced penalties in 21 U.S.C. § 841(b) for distributing in excess of one kilogram of heroin. The argument is based on the fact that the quantities of drugs distributed were not alleged in the indictment.

We have previously explained why we do not require that the quantities be alleged in the indictment in order for the enhanced penalty provisions to apply. *See United States v. Levy*, 955 F.2d 1098 (7th Cir.), *cert. denied*, 506 U.S. 833, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). We pointed out that while defendants are entitled to receive notice of the possibility of an enhanced sentence (and defendants here received notice through a separate notice to them or through pretrial discovery), the notice need not be included in the indictment. The quantity of drugs is a sentencing factor, not an element of the offense. *See United States v. Ed-*

*wards*, 36 F.3d 639 (7th Cir.1994). At the sentencing hearing, of course, the defendants must be allowed to contest the quantities of drugs attributed to them. There is no claim here that the sentencing proceedings did not provide them with that opportunity.

Curry's individual challenge to his § 841(b) enhancement is related to his eight prior state court felony convictions for narcotics violations. Prior to trial, the government notified Curry of its intention to seek enhanced penalties pursuant to § 841(b)(1)(A), which provides for a mandatory term of life imprisonment where the defendant has two or more convictions for a felony drug offense at the time he committed the offense for which he is being sentenced. Curry points out, however, that under the sentencing guidelines he would not receive criminal history points because all eight of his prior state court convictions grew out of what has been alleged as the conspiracy in this case. He argues that therefore they should not be relevant under § 841(b). We rejected a similar argument in *United States v. Garcia*, 32 F.3d 1017 (7th Cir.1994). Curry attempts to distinguish Garcia because Garcia continued to participate in the drug conspiracy after his conviction. Curry claims that following his last state court conviction he entered treatment and ceased his drug activity. His argument loses some force, however, when we remember that before his last conviction he had seven other convictions, which are harder to explain away and which support the draconian enhancement which was correctly applied to him under § 841(b).

Next we go to the issue of drug quantities reasonably foreseeable to certain defendants, pursuant to United States Sentencing Guideline § 2D1.1. Lee and Smith both contend that they were held accountable for much larger quantities than they should have been. However, the court clearly articulated its reasons for each calculation as required. *See United States v. Goines*, 988 F.2d 750 (7th Cir.1993).

Lee was found accountable for 30 kilograms of white heroin and at least 5 kilograms of crack, giving him an offense level of

38. He contends that the judge erred in the calculations of these amounts. We note that the judge would have had to err in both calculations in order for the offense level to be lowered, and the error as to cocaine base would have to be significant. He is eligible for level 38 for distributing either 30 kilograms of heroin or 1.5 kilograms of cocaine base.

Specifically, Lee contends that the judge's calculations assume that the heroin packets with which Lee was involved weighed .15 grams on the average. The judge's estimate—and he is allowed to estimate as we said in *United States v. Acosta*, 85 F.3d 275 (7th Cir.1996)—is based on all but one of the seizures of heroin made during the course of the conspiracy. The one exception was a seizure on December 12, 1990, from William Johnson; those packets weighed substantially less than the others. Johnson's heroin was not included in the calculations and Judge Holderman did not rely on the weight of these bags, a determination which cannot be said to be erroneous. Johnson, in a recorded conversation with the agent who bought the heroin, said that his heroin was different from Richardson's. The jury apparently believed him and acquitted him of the conspiracy charges in this case. It was not error to refuse to calculate quantities based on Johnson's bags, which were not typical of those sold by the conspiracy.

Lee also contends that Judge Holderman improperly estimated the time during which he was a member of the conspiracy. He argues that he should not be held accountable for any heroin after he ceased being a runner. However, he continued to deal with and sell heroin for the conspiracy. Changing jobs does not remove one from a conspiracy. Further, he contends that it was error to find that 2 months worth of crack sales were reasonably foreseeable to him. We disagree. The record shows that Lee sold crack at the beefstand. He was identified by Cal in a videotape of sales from that location, where large numbers of sales took place in a rather open fashion. It is not error to find that Lee could foresee 5 kilograms of crack sales.

Likewise, Smith contends that the amounts attributed to him were not reasonably foreseeable. Judge Holderman calculated Smith's offense level based on 30 kilograms of brown heroin. The calculation is not clearly erroneous. In addition, however, because Smith had two felony drug convictions that enhance his sentence under § 841(a)(1), he would be eligible for a life sentence if at least 1 kilogram of heroin or 50 grams of cocaine base were found to be foreseeable to him. Smith said in a tape-recorded conversation with Agent Rotunno that he worked for Tate and Richardson for about 3 years selling heroin and that he made about $50,000. That would mean that Smith personally sold 3.5 kilograms of brown heroin, clearly sufficient to support a life sentence. As it turned out, the government moved for a downward departure, giving the court discretion to impose the sentence of 194 months, which Smith ultimately received.

Palmer raises a different sentencing issue. The court found that he could reasonably foresee 2 months worth of crack distribution from the beefstand, where he personally was selling crack for a 2–month period. Palmer contends that he should receive a reduction of his sentence because he was a minor participant, under § 3B1.2(b) of the guidelines. However, finding that Palmer was responsible for 2 months of sales of one of the drugs the conspiracy sold from one of the several locations it used is clearly not holding Palmer responsible for the sales of the broader operation. If the court had held Palmer responsible for all the drugs sold at this spot, his argument would be more persuasive. As it is, the finding already inherently acknowledges Palmer's limited responsibility. It was not error to decline to apply the 2–point reduction he seeks.

Finally, ending our discussion with a whimper, not a bang, we mention Westmoreland's claim that the disparity in sentencing for crack as opposed to cocaine violates the Constitution. The argument has been laid to rest in this court. *See United States v. Lawrence*, 951 F.2d 751 (7th Cir.1991); *United States v. Booker*, 73 F.3d 706 (7th Cir. 1996).

The convictions and sentences of the defendants are

AFFIRMED.