UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose RIVERA, a/k/a Junior,
Defendant–Appellant.

No. 97–2570.

United States Court of Appeals,
Seventh Circuit.

Argued May 20, 1998.

Decided Aug. 31, 1998.

Gil M. Soffer (argued), Office of U.S. Atty., Chicago, IL, for Plaintiff–Appellee.

Douglas P. Roller (argued), Roller & Assoc., Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, MANION, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Jose Rivera sold large quantities of cocaine to Eric Bradley, a drug dealer in Chicago. Bradley and other coconspirators then repackaged the cocaine and sold it "retail" to individual users throughout Chicago. Eventually the Drug Enforcement Agency (DEA) arrested Bradley, several of Bradley's employees, and Rivera. Rivera was indicted for conspiracy to sell narcotics; a jury convicted him. Rivera challenges the admissibility of wiretap audiotapes, the district court's instruction on aider and abettor liability, and prejudicial comments by the prosecutor. We affirm.

### I.

Between March 1993 and November 1994, Eric Bradley operated a cocaine distribution enterprise in the Chicago area. At the height of the conspiracy, Bradley sold as much as 40 kilograms of cocaine in one week, at the going rate of about $22,000 per kilo. Bradley also employed several workers to serve as salespersons, accountants, and couriers. These included Jeffrey Williams, Tylus Allen, Byron Young, and Kevin Flowers.

Jose Rivera supplied Bradley with some of the cocaine Bradley resold. Bradley would frequently buy at least four kilograms of cocaine from Rivera at a time, and at least once, bought twenty kilograms in a single transaction. In February 1994, the DEA began investigating Bradley and Rivera. The DEA's investigation included courtauthorized wiretaps of cellular phones used by Rivera, surveillance of both Rivera and Bradley, and other investigative techniques.

In July 1996, a grand jury indicted Rivera, along with Bradley, Flowers, Young, Williams, and Allen with conspiracy to possess with intent to distribute cocaine. 21 U.S.C. § 846; 18 U.S.C. § 2. Williams and Allen pleaded guilty; Rivera went to trial, where Williams and Allen testified against him. Bradley pleaded guilty, but did not testify at Rivera's trial. A jury convicted Rivera, and the district court sentenced him to a prison term of 200 months and a fine of $20,000.

Rivera contends that a compilation tape of the intercepted cellular phone conversations was improperly admitted into evidence. He also argues that the district court erred by instructing the jury on aider and abettor liability, given the facts as they had been developed. Finally, Rivera asserts that comments made by the prosecutor during closing arguments were prejudicial misstatements of law.

### II.

Rivera first complains the compilation tapes made from the court-authorized wiretap were improperly admitted into evidence. In July 1994, and again in November 1994, the chief district court judge for the Northern District of Illinois authorized the interception of telephone calls on cellular phones used by Rivera. Many of the telephone calls recorded during these periods were conver-

sations between Bradley and Rivera regarding the quantity of cocaine to be sold, the price of the cocaine, the quality of cocaine delivered, and other topics related to cocaine distribution, such as drug busts and arrests.

For each telephone call that came in, the DEA used a machine which simultaneously made three cassette tape recordings of the telephone call. Upon the expiration of the wiretap order, one set of tapes was sealed and stored pending judicial sealing pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18. U.S.C. § 2510 *et seq.* The DEA gave a second set of tapes to the U.S. Attorney's office, and kept the third set for its own use. The Title III sets of tapes were then taken to the chief judge of the Northern District of Illinois and judicially sealed in accordance with Title III. Rivera offered no objection to the admission of the judicially sealed tapes.

In preparation for trial, the DEA used its set of tapes to create a compilation of the most relevant phone calls to be played at trial. At trial, the government sought to play the compilation tape created by the DEA. Rivera objected on the grounds that with respect to these tapes, the DEA failed to comply with Title III, and that therefore, they are inadmissible under Title III. Rivera also argued that in the alternative, the government failed to lay a proper foundation for admittance of these tapes under the Federal Rules of Evidence.

■ Title III generally prohibits disclosure of intercepted telephones calls. 18 U.S.C. § 2511(1) ("Except as otherwise specifically provided in this chapter any person who ... (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication ... shall be punished."). But subsections (1) and (2) of 18 U.S.C. § 2517 authorize the use and disclosure of the contents of intercepted wire or oral communications between law enforcement officers for investigative purposes, and § 2517(3) provides that witnesses testifying in court may disclose the content of intercepted wire or oral communications once the investigators have complied with the provisions of Title III. Section 2518(8)(a) provides, in pertinent part, that

Immediately upon the expiration of the period of the [wiretap order,] such recordings shall be made available to the judge issuing such order and sealed under his directions.... Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. § 2518(8)(a). Presenting an issue of first impression, Rivera contends that because § 2518(8)(a) specifically authorized duplicate tapes to be used for investigative purposes, and does not mention the use of duplicate tapes for evidentiary purposes, the statute implicitly bars the use of duplicate tapes at trial. In other words, "expressio (or inclusio) unius est exclusio alterius," the inclusion of one implies the exclusion of all others. Black's Law Dictionary (West 6th ed.1990); *see, e.g., E.E.O.C. v. Illinois Dept. of Employment Security,* 995 F.2d 106, 108 (7th Cir.1993).

This canon of statutory construction does not have uniform application, *see, e.g., Diehl v. Twin Disc, Inc.,* 102 F.3d 301, 308 (7th Cir.1996), and in the context of § 2518(8)(a), it does not apply. Most of § 2518(8)(a) discusses procedures to preserve the tapes after they are made (rather than procedures designed to prevent the disclosure of the contents of the tapes). For example, this section requires that the tapes must be made available to the authorizing judge immediately after the expiration of the wiretap order, and that the tapes be sealed according to this judge's instructions. Given this context, the provision addressing duplicate tapes makes clear that the sealing is not intended to deprive law enforcement officers from having duplicates and from disclosing duplicates to other law enforcement officers. Section 2518(8)(a) "gives no indication that Congress intended that duplicate tapes be subject to the same requirements as original tapes. For example, it would seem that duplicate tapes need not be judicially sealed, for the

section envisions their use by law enforcement officials but makes no provision for their unsealing. Nor is there any indication in the legislative history that Congress intended that duplicate tapes be subject to the same requirements as original tapes." *United ed States v. Maldonado–Rivera*, 922 F.2d 934, 954 (2d Cir.1990). Only one set of tapes need be sealed; the government need not seal all copies. *See also United States v. Rengifo*, 789 F.2d 975, 979 (1st Cir.1986). This reading also comports with the law pertaining to other sealed materials, where access to the sealed material is limited, but still may be used by law enforcement officials. Cf. *United States v. Corbitt*, 879 F.2d 224, 235 & n. 14 (7th Cir.1989) (noting that despite the presence of a judicial seal, grand jury materials and presentencing reports are utilized in ongoing investigations).

■ The statute then continues: "The presence of the seal provided for by this subsection or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use *or disclosure* of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517." 18 U.S.C. § 2518(8)(a) (emphasis added). This provision broadly states that *the content* of such recordings may be disclosed in court proceedings, but places no restrictions on *the form* of the disclosure. For example, it does not, by its terms, prohibit the use of transcripts or testimony by non-participants to the intercepted telephone calls. Because Congress has chosen not to limit the form of the disclosure in § 2518(8)(a), we are hesitant to find an implied limitation. We also note that if Congress barred the use of duplicate tapes, the result would be unwieldy and cumbersome. The government would have to use the originals in trial, which would require much more court time. For example, the government noted at oral argument that out of the many hours of telephone calls recorded, the government played only between one and two hours of recorded calls for the jury. This was a much more efficient process. The defendant could have objected if something exculpatory were left out. Cumbersome requirements should not be inferred from mere legislative silence. "An inference drawn from congressional silence certainly cannot

be credited when it is contrary to all other textual and contextual evidence of congressional intent." *Burns v. United States*, 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991). Moreover, the use of duplicates allows the original tapes to remain sealed, preserving the authenticity of the original tapes. This seal ensures that if Rivera had reason to question the authenticity of the recording, or wished to assert that misleading editing has been done, the original tapes would be available to serve as the definitive record of what was recorded off of the cellular phone tap. In sum, as long as the government complies with Title III, it may, at trial, disclose the contents of the recordings in whatever fashion it chooses, including the use of duplicate and compilation tapes.

■ Of course, the government must also lay a proper foundation for the admission of duplicate and compilation tapes, and Rivera contends that this was not done. As we recently noted in *United States v. Brown*, 136 F.3d 1176, 1181 (7th Cir.1998), a proper foundation for the admission of audiotapes may be established in two ways: a chain of custody could establish that the tapes are in the same condition as when recorded, or alternatively, other testimony could be used to establish the accuracy and trustworthiness of the evidence. *See also United States v. Carrasco*, 887 F.2d 794, 802 (7th Cir.1989). As we noted in Brown, "a presumption that a system of regularity accompanied the handling of evidence [attaches] if the exhibits are at all times within official custody. Furthermore, the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." 136 F.3d at 1182 (citations omitted).

The government in this case sufficiently established a chain of custody with regard to the DEA's set of tapes. Special Agent Greg Brotan of the DEA supervised the interception of the cellular telephone conversations. The actual interception took place within the offices of the DEA. As telephone calls were made and recorded, DEA agents monitoring the wiretap equipment would maintain a log which reflected the date, time, and content of the calls. Each telephone call was simultaneously recorded on three cassette tapes.

During the monitoring, the tapes were stored within the wiretap room. Upon the conclusion of the monitoring, Agent Brotan kept the DEA's set of tapes. Agent Brotan initially kept these tapes in a box in the monitoring room and eventually moved them to his personal office where he stored them in a locked cabinet. In preparation for trial, Special Agent David Grant used Agent Brotan's set of tapes to create a compilation tape of individual calls, and this compilation tape was eventually played for the jury. The evidence establishes that the DEA's set of tapes, and the compilations derived therefrom, remained in official custody from the time they were recorded until the time they were played in court. Rivera's contentions that the cassette tapes could have been maintained in a more secure facility with better .diligence merely goes to the weight that the jury would give the tapes, not to their admissibility.

Also significant is that the DEA's set of tapes was as "original" as the set of tapes sealed in accord with Title III. Either set of tapes could have been chosen to be sealed, and the government was not required to compare the two sets of tapes to determine that they were the same: the procedure (and supervision over the procedure) established that the two sets of tapes were twins. Addressing the same issue, the First Circuit noted that no comparison of the tapes was required: "This is not a situation, as defendant implies, where one tape recording was made and subsequently copies were made from it. There was no need for [the agent] to check his tape against the original tape; he used an original tape." *United States v. Rengifo*, 789 F.2d 975, 980 (1st Cir.1986). And Special Agent Grant did compare the compilation tape he made to the DEA's set of tapes. In sum, given the government's showing that all tapes remained in official custody at all times, the procedures used to initially record the cellular phone calls, and the procedures used to create the compilation tape actually played for the jury, the district court did not abuse its discretion in permitting the jury to consider them.

Rivera also argues that the government has not followed its "standard" practice making compilation tapes from the judicially sealed tapes. The record is, in fact, unclear on what "standard" governmental practice is, but we note that other courts have specifically approved the same procedure used by the government in this case. For example, in *United States v. Denton*, 556 F.2d 811, 816 (6th Cir.1977), the Sixth Circuit held that the government could enter a composite tape as a summary pursuant to Fed.R.Evid. 1006, and that the government laid a proper foundation regarding the accuracy and authenticity of the composite tape. "Defense counsel had adequate opportunity to cross-examine the agents as to any lack of authenticity or accuracy in the composition." *Id.* Despite Rivera's claims of Title III violations and lack of foundation, we see no error in admitting the composite tapes made from the DEA's duplicate set of intercepted cellular phone conversations.

■ Next, Rivera challenges the district court's decision to give the jury an instruction on aider and abettor liability. The district court instructed the jury that if it found that the defendant had aided and abetted Bradley's conspiracy, he could be found guilty of the substantive charge of conspiracy. *See* 18 U.S.C. § 2. Rivera agrees that the district court's instruction correctly stated the law. But Rivera argues that the evidence establishing his guilt as a conspirator could not be used to establish his guilt as an aider and abettor because the two concepts are mutually exclusive, and that, given this view of the facts, the government failed to establish that an instruction on aider and abettor liability was warranted.

Our case law makes clear that conspirators will almost always aid and abet the same conspiracies, and that proof of either is sufficient to sustain a conviction. *See United States v. Ortega*, 44 F.3d 505, 506 (7th Cir. 1995) ("While a conspirator is almost always an aider and abettor, an aider and abettor is often not a conspirator.") (citations omitted). "A defendant may be guilty of conspiracy either as an actual participant or as an aider and abettor, and there is no need to distinguish between theories in the verdict. Aiding and abetting need not be specifically alleged in the indictment, and a defendant indicted for a substantive offense may be convicted as an aider and abettor upon prop-

er proof so long as no unfair surprise results." *United States v. Corral–Ibarra*, 25 F.3d 430, 435–36 (7th Cir.1994) (citations omitted); *see also United States v. Pearson*, 113 F.3d 758, 760 (7th Cir.1997). In light of this case law, the district court did not err in considering evidence which tended to support both the conspiracy charge and the aider and abettor charge in deciding whether to give an aider and abettor instruction.

■ And the evidence against Rivera warranted the district court's instruction on aider and abettor liability. Rivera supplied the conspiracy with more than 50 kilograms of cocaine over an eight-month period. At least some of these sales were on credit. For example, Allen testified that at one time, he and Bradley were counting money to give to Rivera "[f]or the cocaine that [Bradley] had just got." Rivera suggests that he did not sell on credit, but rather, that this was merely a simple buy/sell transaction where the delivery and payment were "temporally separate." There is little if any difference between a sale on credit, and a sale where delivery and payment are temporally separate. Furthermore, sales on credit, in combination with frequent and repeated transactions, justify an aider and abettor instruction. *See, e.g., United States v. Blankenship*, 970 F.2d 283, 287 (7th Cir.1992); *United States v. Kasvin*, 757 F.2d 887, 891 (7th Cir.1985). This same evidence would permit a jury to infer that Rivera did not have a mere buyer/seller arrangement with Bradley. The frequency of the sales, the large amount of the transactions, the transactions performed on credit, and the close working relationship shown between Rivera and Bradley would permit a jury to find that Rivera knew of the conspiracy, participated in it, and sought to make it succeed. *Pearson*, 113 F.3d at 760–61. The district court did not abuse its discretion in giving the jury an instruction on aider and abettor liability.

■ Next, Rivera asserts that the prosecutor misstated the law regarding the buyer/seller defense and aider and abettor liability during his closing argument. Before the district court, however, Rivera only objected to the prosecutor's remarks regarding the buyer/seller defense. Thus, we review the district court's decision to allow those remarks pertaining to the buyer/seller defense for an abuse of discretion, *see United States v. Lovelace*, 123 F.3d 650, 655 (7th Cir.1997), but review the prosecutor's remarks regarding aider and abettor liability for plain error. *See, e.g., United States v. Moore*, 115 F.3d 1348, 1361 (7th Cir.1997) (because defendant failed to make argument at trial, review is for plain error). In assessing allegations of prosecutorial misconduct in closing arguments, we first consider the prosecutor's remarks in isolation to see whether they are improper. *United States v. Richardson*, 130 F.3d 765, 779 (7th Cir.1997). Then we review the remarks in context to see if they had denied the defendant a fair trial. *Id.* In so doing, we consider the nature and seriousness of the statement; whether the conduct of defense counsel invited the remark; whether the district court issued a curative instruction; whether the defendant had an opportunity to rebut the remark; and finally we look to the weight of the evidence against the defendant. *Id.*

■ With regard to the buyer/seller defense, the prosecutor compared Rivera to an "anonymous seller just standing on a street corner selling a gram to someone who happens to drive by." Rivera objected to this (and similar statements) as misstating the law, and the district court instructed the jury to follow the law as stated in the jury instructions, and later instructed the jury that "[m]ere proof of the existence of a buyer/seller relationship is not enough to convict one as a co-conspirator on drug conspiracy charges." The district court's instructions also emphasized that the jury had to find that Rivera either knowingly joined the conspiracy, or knowingly rendered active assistance to the conspiracy with the intent of making it succeed. In essence, the prosecutor's remarks merely reflected the reality that a wholesaler has an interest in his retailer's success. Because selling a single kilogram of cocaine to one person is simpler than selling 1000 grams of cocaine to individual users, the jury could infer that Rivera had a substantial interest in the success of Bradley's conspiracy. And in light of the judge's contemporaneous curative instruction and subsequent accurate jury instructions, the prosecutor's remarks, even if improper, were not prejudicial. *Richardson*, 130 F.3d at 779

("at the end of a long trial, with the judge giving a curative instruction, this remark does not make for prejudicial error").

On the issue of aider and abettor liability, Rivera takes issue with the prosecutor's comment that "What better aid and assistance can you give to a drug conspiracy than to provide them with drugs?" He contends that "a seller of drugs is *not* an aider and abettor of a conspiracy under any circumstances." (emphasis in original). Rivera misconstrues the buyer/seller defense and its interplay with aider and abettor liability. Merely selling drugs is not *per se* aiding and abetting a conspiracy to possess drugs with intent to distribute, *United States v. Thompson*, 944 F.2d 1331, 1342 (7th Cir.1991), but if from the evidence of sales a rational jury could conclude that the seller of drugs associated himself with the criminal venture, participated in it, and sought by his actions to make it succeed, he has in fact aided and abetted the conspiracy. *United States v. Pino-Perez*, 870 F.2d 1230, 1232 (7th Cir. 1989) (en banc). The prosecutor in essence asked the jury to draw an inference of the latter, rather than the former. We see no error, plain or otherwise, in the prosecutor's comments regarding aider and abettor liability.

Summarizing, we find no error in the district court's admission of the wiretap tapes, or decision to give the jury an instruction on aider and abettor liability. Also, we find that the prosecutor's comments during closing argument contained no error, and thus we affirm Rivera's conviction.