**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John T. HUNTER, Jr., Defendant–
Appellant.**

No. 95–2169.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1996.

Decided June 12, 1996.

Rehearing Denied July 2, 1996.

Barry Rand Elden, Chief of Appeals, Virginia Kendall (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

John D. Long (argued), Patrick Moloney Long, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, CUMMINGS and BAUER, Circuit Judges.

BAUER, Circuit Judge.

In crime as in other things, life sometimes imitates art. Moviegoers who saw the film "Point Break" will have vivid recollections of bank robbers masked as American presidents. John T. Hunter, Jr. and his father may not have been surfers in pursuit of the perfect wave, but they did use a similar *modus operandi*. Hunter, masked as various presidential figures including Michael Dukakis, conspired with his father to rob numerous banks in several states. A jury convicted him of conspiring to rob banks, of robbing sixteen banks, and of using and carrying a firearm during each of those robberies. 18 U.S.C. § 371; 18 U.S.C. §§ 2113(a) & (d); and 18 U.S.C. § 924(c)(1). Hunter raises several claims concerning the denial of his motion to suppress, the jury impanelment, and certain statements made by the prosecutor during closing argument. We affirm.

*I. Search Warrant*

After Federal Bureau of Investigation agents told his mother they were looking for him, Hunter turned himself in to the authorities. Several days later, the FBI obtained a search warrant for Hunter's residence at 510 Palace Court in Schaumburg, Illinois. During the search, FBI agents recovered various items linking Hunter to the bank robberies. Not surprisingly, Hunter filed a motion to suppress the evidence. The district court denied the motion. Hunter argues (as he did before the district court) that the search warrant was issued without probable cause because it failed to state that 510 Palace Court was his residence and because it did

not identify a sufficient nexus between 510 Palace Court and the items sought. He further contends that the affidavit submitted to secure the warrant contained intentionally or recklessly misstated facts and thus the district court should have suppressed the evidence.

■ We review *de novo* the district court's determination that probable cause existed to issue the warrant. *Ornelas v. United States,* — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).[1] In doing so, however, we take care "both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at —, 116 S.Ct. at 1663.

■ Hunter contends that the search warrant issued without probable cause because the warrant application and affidavit did not state how the FBI knew that 510 Palace Court was his residence, and therefore failed to establish any nexus between him, the address, and the items sought. Hunter misreads one sentence in *United States v. Brown,* 832 F.2d 991, 994 (7th Cir.1987), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 243 (1988), to support his contention that failure to state in a warrant affidavit how the police knew an address was the defendant's address automatically negates a finding of probable cause. We actually stated that the totality of the circumstances, including not only the failure to show "how the police knew that the ... apartment was truly one of Brown's addresses" but the *"paucity of information suggesting that a search of the ... address would uncover evidence of wrongdoing,"* did not support a finding of probable cause. *Id.* at 994 (emphasis added). The affidavit's failure to state explicitly that 510 Palace Court was Hunter's residence, by itself, is not a fatal flaw.

Furthermore, the warrant application and affidavit in this case clearly established that the place to be searched *was* Hunter's residence. Attachment A to the search warrant and affidavit described the place to be

searched as "[t]he residence at 510 Palace Court, Schaumburg, Illinois...." The affidavit referred four times to Hunter's residence; it made no reference to any other place connected to Hunter. Although Hunter correctly notes that the affidavit did not explicitly state that 510 Palace Court was his residence, that is the only logical conclusion supported by a common-sense reading of the affidavit. *See Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983).

■ Hunter further contends that the warrant application and affidavit failed to establish any link between him, 510 Palace Court, and the items sought. We disagree. Hunter does not challenge the existence of probable cause to believe that he was the "Dukakis robber." Indeed, he turned himself in to the FBI three days before the search. That in itself weighed in favor of finding probable cause to search Hunter's residence.

Moreover, the warrant application and affidavit contained numerous facts that supported the magistrate's conclusion that it would be reasonable to seek evidence of the bank robberies in Hunter's residence. *See United States v. Malin,* 908 F.2d 163, 166 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). The application indicated that FBI agents had recovered a number of incriminating items during a search of John Hunter, Sr.'s house. *See United States v. Jones,* 994 F.2d 1051, 1057 (3d Cir.1993) (magistrate may consider evidence seized from co-conspirator's residence in evaluating probable cause to search defendant's residence). Furthermore, Hunter and his father used the same *modus operandi* for the numerous robberies, including the clothing and masks they wore and the guns they carried. The continuous nature of the crimes made it reasonable to conclude that they preserved those items for future use, and that Hunter might keep them in his residence. Additionally, the affidavit stated that Hunter's ex-wife told the FBI that he maintained an office in his residence and that he kept meticulous records. In light of these facts, it was reasonable to seek incriminating evidence in Hunter's residence.

■ Hunter next contends that the district court erred in denying him an evidentiary hearing about alleged material misstatements and omissions in the warrant affidavit. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978). We review a district court's refusal to hold a *Franks* hearing for clear error, and we presume that the affidavit supporting the search warrant is valid. *United States v. Walker,* 25 F.3d 540, 544 (7th Cir.), *certs. denied,* —— U.S. ——, ——, 115 S.Ct. 371, 531, 130 L.Ed.2d 323, 434 (1994).

■ To obtain a *Franks* hearing, Hunter had to make a "substantial preliminary showing" that the affiant intentionally or recklessly made a false statement in the affidavit, and that the false statement was "material," or necessary for a finding of probable cause to issue the warrant. *United States v. Skinner,* 972 F.2d 171, 177 (7th Cir.1992). After reviewing the affidavit, we conclude that none of the statements challenged by Hunter was false. For example, the various statements attributed to his ex-wife in the affidavit accurately reflect the written summary of her interview with an FBI agent. Hunter therefore failed to make the threshold showing necessary to warrant a *Franks* hearing.

## II. *Jury Impanelment*

■ Hunter next argues that the government improperly used peremptory challenges to remove African Americans from the venire on the basis of their race, in violation of the principles established in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Supreme Court has articulated a three-step analysis for evaluating *Batson* claims. *Id.* at 96–98, 106 S.Ct. at 1722–24. First, the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. *Id.* at 96–97, 106 S.Ct. at 1722–23. If the defendant makes this requisite showing, the burden shifts to the prosecutor to provide a race-neutral reason for striking the prospective juror. *Id.* at 97–98, 106 S.Ct. at 1723–24. The district court then must decide whether the defendant carried his burden of proving

purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724.

■ The district court conducted a *Batson* inquiry, and concluded that Hunter had not established a prima facie *Batson* violation because the government had used its peremptory challenges to strike only some of the African Americans from the venire, and because several other African Americans had asked to be excused for other reasons. The court further found that even if Hunter had made a prima facie showing, the prosecutor had given valid race-neutral reasons for the challenged strikes. Because the district court's determination that the government did not discriminate hinges on its evaluations of the credibility of both potential jurors and the prosecutor, we accord it great deference and will not disturb it absent clear error. *United States v. Brown,* 34 F.3d 569, 571 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1136, 130 L.Ed.2d 1097 (1995).

Hunter objected to the government's peremptory challenges of four venire members. In response, the prosecutor indicated that he had challenged one prospective juror because of his limited education, his youth, his unstable employment history, his unmarried status, his lack of family roots and ties to the community, and the fact that he lived at home with his parents. The prosecutor explained that he struck the second prospective juror because she had not completed high school, was separated from her husband, and had no job. The government challenged the third panel member because of a "gut feeling" based in part on the "extremely nervous," "hesitant," and "unhappy" way she had answered voir dire questions, as well as her unmarried status. Finally, the government explained that it struck the fourth prospective juror because she had only a high school education and because her confused answers to certain voir dire questions called into question her ability to follow the complex evidence during the trial.

■ We find nothing clearly erroneous in the district court's determination that Hunter failed to establish a *Batson* violation. Even assuming that Hunter made a prima facie showing that the government challenged the four prospective jurors because

of their race, the reasons the government gave are valid, race-neutral reasons for striking prospective jurors. *See, e.g., United States v. Brown,* 34 F.3d at 572 (unemployed status); *United States v. Marin,* 7 F.3d 679, 687 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994) (lack of education); *United States v. Williams,* 934 F.2d 847, 849–50 (7th Cir. 1991) (age and marital status); *United States v. Briscoe,* 896 F.2d 1476, 1489 (7th Cir.), *cert. denied sub nom. Usman v. United States,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990) ("intuitive assumptions that are not fairly quantifiable"). The district court credited the government's explanations, and absent some exceptional circumstance, we give conclusive weight to the district court's credibility determinations. Hunter's *Batson* claim fails.

### III. *Closing Argument*

Hunter's final claim concerns allegedly improper comments made by the prosecutor during closing argument. We need not discuss each challenged comment. Suffice it to say that we find no improper statement prejudiced Hunter's right to a fair trial, nor did the challenged statements taken together prejudice that right. *See United States v. Butler,* 71 F.3d 243, 254 (7th Cir.1995).

### CONCLUSION

For the foregoing reasons, we affirm Hunter's conviction.

AFFIRMED.